**ABEX CORPORATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 18815.**

United States Court of Appeals
Sixth Circuit.

Jan. 8, 1970.

**929**

Earl W. Kintner, and George Ronald Kucik, Washington, D. C., for petitioner; Ralph S. Cunningham, Jr., Mark R. Joelson, Jack L. Lahr, George R. Kucik, James P. Mercurio, Washington, D. C., on brief; Carson M. Glass, Washington, D. C., Murray S. Monroe, Cincinnati, Ohio, of counsel.

Frederick H. Mayer, Atty., F. T. C., Washington, D. C., for respondent; John V. Buffington, Gen. Counsel, J. B.

Truly, Asst. Gen. Counsel, F. T. C., Washington, D. C., on brief.

Before WEICK and EDWARDS, Circuit Judges, and BROOKS,* District Judge.

EDWARDS, Circuit Judge.

Petitioner Abex Corporation seeks this court's vacation of a divestiture order and the dismissal of a complaint filed before the Federal Trade Commission (FTC). The complaint alleged that Abex had violated the antimonopoly provisions of Section 7 of the amended Clayton Act, 15 U.S.C. § 18 (1964), by acquisition of the S. K. Wellman Company. The FTC, after hearings, held that the acquisition was unlawful and entered a divestiture order and an injunction against future acquisitions of the same nature.

Petitioner presents three claims: 1) The FTC order defining a "submarket" of sintered metal friction materials is not supported by substantial evidence. 2) The FTC order in finding anticompetitive effect of the acquisition is not supported by substantial evidence. 3) The injunction entered by the FTC is over broad.

Abex Corporation is the successor name to American Brake Shoe Company. On April 16, 1963, American Brake Shoe, a large conglomerate which manufactures railroad products, hydraulics, castings and friction materials merged with the S. K. Wellman Company. Wellman at the time manufactured only one line of products; these were sintered metal friction materials for clutches, brakes and transmissions for heavy duty equipment and machinery. Wellman's principal customers had been aircraft companies, mining companies and the like.

Prior to the merger, American Brake Shoe sought Commission approval for its purchase of Wellman. After 13 months, American Brake Shoe proceeded with the merger without receiving such approval.

* Honorable Henry L. Brooks, Chief United States District Judge for the Western District of Kentucky, sitting by designation.

At the hearing before the FTC Examiner, Abex insisted and offered evidence tending to prove that sintered friction materials were only a small part of a large competitive field which included both "organic" friction materials (asbestos brakes, etc.) and metal friction materials. The Trial Examiner made findings of violation of Section 7 of the Clayton Act by Abex's acquisition of Wellman on two different bases—first, assuming that all friction materials constituted the overall market (or "universe") and second, assuming that sintered metal friction materials constituted a valid submarket. The FTC specifically held that sintered friction materials constituted a valid submarket and declined to consider the wider "universe" for which Abex argued. The FTC affirmed the findings of the Examiner as to the anticompetitive effect of the acquisition and ordered divestiture and a 10-year injunction against similar acquisitions.

Both the Examiner and the Commission cited and relied on an analysis of the sintered metal friction material market which tended to show that Abex, by its acquisition of Wellman, moved from third to a dominant first place in the market.

The Commission's opinion on this score said:

"[I]t is obvious that the elimination of Wellman as a substantial competitor from the already limited number of producers necessarily leads to the results proscribed by the statute. The margin of error, if any, residing in the market share percentages computed from the survey is therefore of little significance. Our examination of the record accordingly constrains us to affirm the finding of the examiner that the effect of the merger may be to substantially lessen competition in the production and sale of sintered metal friction materials."

■ As to the first appellate issue concerning whether sintered metal friction materials were a valid submarket, Abex appears to us to rely more upon theory than upon economic realities. In essence, it asserts that any clutch or braking device which currently uses sintered metal friction could be so designed as to supplant sintered metal friction by organic or other metal friction. But the record is singularly devoid of any testimony that indicates that any such competition exists as a practical matter.

There is evidence from which the FTC could have concluded that sintered metal friction devices are up to 40% more expensive than organic and hence are used in specialty applications which through heavy use wear out organic friction devices too quickly.

In its 1960 annual report petitioner said:

"For severe applications, American Brakeblok manufactures friction parts of sintered metals: powdered metals which are molded under pressure and then fused under heat. These materials handle power transmission on heavy construction equipment and braking on jet aircraft such as the Boing 707 and Douglas DC-8. They are also used in some automotive transmissions where special heat-resistant characteristics are required."

Petitioner's 1958 annual report had been even more specific about the special quality of sintered metal:

"Traditional friction materials cannot stand up under the heat and pressure generated in the brakes of jet aircraft, or in the transmission of heavy-duty earthmoving equipment. Technological know-how enables Brake Shoe to create parts like these clutch discs out of powdered metals, which are shaped under pressure and then sintered until they fuse."

Petitioner's 1961 annual report provides this comparison between the functions of organic and sintered metal friction materials:

"Through its American Brakeblok Division, the company is a major producer of both organic and metallic friction materials. Our principal

products are brake lining for cars, trucks and buses. These are made of asbestos and other materials bonded under heat and pressure with an organic resin.

\* \* \* \* \* \*

"A fully-loaded jet airliner such as the Boeing 707 weighs about 250,000 pounds and lands at speeds as high as 138 miles per hour. Ordinary materials would melt under the terrific heat generated by its brakes, so American Brakeblok makes jet plane braking materials out of sintered metals. This type of material is first formed out of powdered metals into near-finished shape, and is then fused solid under heat and pressure.

"Sintered materials also have the heat and wear resistance needed to stand up under grueling use in crawler tractors and heavy earthmoving equipment. American Brakeblok provides clutch and brake parts of sintered metals for construction equipment and other types of industrial machinery."

The record also contains detailed expert testimony concerning the functional and economic differences between sintered metal friction materials and organic friction materials, as well as similarly detailed testimony concerning the differences in methodology and plant equipment required to produce them.

Seven *indicia of a valid submarket* are set forth in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962):

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.[42]

"42. The cross-elasticity of production facilities may also be an important factor in defining a product market within which a vertical merger is to be viewed. Cf. United States v. Columbia Steel Co., 334 U.S. 495, 510–511, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 592 (D.C.S. D.N.Y.). However, the District Court made but limited findings concerning the feasibility of interchanging equipment in the manufacture of non-rubber footwear. At the same time, the record supports the court's conclusion that individual plants generally produced shoes in only one of the product lines the court found relevant.

However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. United States v. E. I. du Pont de-Nemours & Co., 353 U.S. 586, 593–595, 77 S.Ct. 872, 1 L.Ed.2d 1057. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.[43] Because § 7 of the Clayton

"43. See generally Bock, Mergers and Markets, An Economic Analysis of Case Law 25–35 (1960).

Act prohibits any merger which may substantially lessen competition 'in *any* line of commerce' (emphasis supplied), it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed.[44]

"44. United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 592, 595, 68 S.Ct. 1107, 92 L.Ed. 1533; A. G. Spalding & Bros. v. Federal Trade Comm'n, 301 F.2d 585, 603 (C. A. 3rd Cir.); American Crystal Sugar Co. v. Cuban-American Sugar Co., 259 F.2d 524, 527 (C.A. 2d Cir.); United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 603 (D.C.S. D.N.Y.). See also note 39, *supra.*"

Brown Shoe Co. v. United States, supra at 325–326, 82 S.Ct. at 1523–1524.

It seems clear to us that there is more than substantial evidence to support at least these *indicia* of a separate submarket. 1) As we have noted, sintered

metal friction materials are substantially higher in price than organic friction materials. 2) They clearly have peculiar characteristics and uses as has been pointed out in the exhibits quoted above. 3) They require an entirely different technology and separate production facilities.

Similar indicia were employed by Judge (now Chief Justice) Burger, writing for the D. C. Court of Appeals in Reynolds Metals Co. v. FTC, 114 U.S. App.D.C. 2, 309 F.2d 223, 226–229 (1962). He held that aluminum florist foil was a distinct market from decorative aluminum foil because of distinct customers, uses and prices.

We hold that there is substantial evidence on the whole record to support the FTC finding that sintered metal friction materials constituted a valid submarket.

The second issue was whether the FTC's findings of anticompetitive effects was supported by substantial evidence. An FTC chart presented in evidence at the hearing and subsequently considered by the Commission, shows the percentage results of the Abex acquisition. The chart shows Abex (American Brake Shoe) absorbed its principal competition and took a dominant position in the submarket. Although appellant attacks this chart as not including all relevant competition, we find in the testimony of industry figures as to market competitors both substantial and highly persuasive testimony as to its inclusiveness.

### Total Shipments and Market Shares of Companies Manufacturing (1962)

| Company | Total Shipments |
|---|---|
| American Brake Shoe Co. | $ 3,517,440 |
| S. K. Wellman Co. | 11,187,086 |
| Sub-total, 2 companies | $14,704,526 |
| Raybestos-Manhattan, Inc. | 5,306,078 |
| The Bendix Corp. | 1,880,990 |
| General Metals Powder Co. | 1,916,921 |
| General Motors Corp. | 450,662 |
| Friction Products Corp. | 7,750 |
| Chrysler Corp. | 1,243 |
| R. G. LeTourneau & Co. | 90,000 |
| Total | $24,358,170 |
| American Brake Shoe Co. | 14.4% |
| S. K. Wellman Co. | 45.9 |
| Sub-total, 2 companies | 60.4% |
| Raybestos-Manhattan, Inc. | 21.8 |
| The Bendix Corp. | 7.7 |
| General Metals Powder Co. | 7.9 |
| General Motors Corp. | 1.9 |
| Friction Products Corp. | — |
| Chrysler Corp. | — |
| R. G. LeTourneau & Co. | 0.4 |
| Total | 100.1% |

Thus, based on 1962 figures, Abex (the third largest manufacturer) merged with Wellman (the largest) so as to acquire 60% of the sintered metal friction market.[1]

In United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), the Supreme Court said:

"Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. See United States v. Koppers Co., 202 F.Supp. 437 (D.C.W.D.Pa.1962)." United States v. Philadelphia Nat'l Bank, supra at 363, 83 S.Ct. at 1741.

In terms of "undue percentage share" of a market, the Supreme Court has upheld anticompetitive findings upon much lower percentages than in our instant case. United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed. 2d 555 (1966); United States v. Philadelphia Nat'l Bank, supra. As to this issue also, we affirm.

The third issue concerns whether the FTC had the power to prohibit Abex from acquiring any other company which manufactured or sold sintered metal friction materials for ten years without prior approval by the FTC.

Section 11(b) of the Clayton Act provides:

"If * * * the Commission * * shall be of the opinion that any of the provisions of [sections 2, 3, 7, and 8 of the Clayton Act] have been or are being violated, it shall * * * issue * * * an order requiring such person to cease and desist from such violations, and divest itself of the stock,

or other share capital, or assets, held or rid itself of the directors chosen contrary to the provisions of sections [7 and 8] of this [Act] * * *." 15 U.S.C. § 21(b) (1964).

 We read the statute as authority for the remedy chosen by the Commission. Ekco Products Co., [1963–1965 Transfer Binder] Trade Reg. Rep. ¶ 16,879 (FTC 1964), aff'd, 347 F.2d 745 (7th Cir. 1965). See also FTC v. Dean Foods Co., 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966); American Cyanamid Co. v. FTC, 363 F.2d 757, 771–772 (6th Cir. 1966).

We do find overbreadth in the words "or sale of" contained in the final paragraph of the order. The submarket as defined by this record really concerned companies which manufactured sintered metal friction materials. The words "or sale of" are stricken from the order as otherwise approved.

As modified above, the order of the Federal Trade Commission is affirmed.

---

1. The FTC chart also indicates that Abex and Wellman together controlled slightly greater percentages of the submarket in 1960 and 1961.